and Fargo, I represent Plaintiff and Appellant Highline Exploration, Inc. This case turns on the phrase, what does it mean for an overriding royalty interest to be, quote, free and clear of all costs and expenses of development and operation. And this appeal turns on whether Highline has put forth a rational argument that that phrase could reasonably be interpreted to allow the, to prohibit the deduction of post production costs. I have three main arguments I want to focus on today. Counsel, I think we first need to determine whether we have jurisdiction and I'd like to go back to that issue. You've asserted that the limited partners of NISCU are currently residents of Montana. Is there anything that establishes they were citizens of Montana at the time of the filing? I just want to clarify, Your Honor, there's three partners of NISCU. There's two, there's Shelly and Frank Hotten who are residents of Montana and there's a corporation too, which is FP Corporation, which main place of business is Montana, but the Texas Corporation. I just want to clarify that. I can't point you to anything, I guess, in the record which specifically says, except for the affidavit that we have in appeal from Mr. Hotten, which says that he's a resident of Montana. I can represent to the court, I guess, that yes, he would have been a resident of Montana. I cannot point you to something in the record that would say at the time this case was filed. We could certainly put something on the record though, Your Honor, if that needs to be clarified. The pleadings also assert that certain defendants were residents of North Dakota. Is there anything that shows us that they were citizens of North Dakota? I can't point you to anything more than what is in their affidavit, Your Honor. Yes, Tammy and William McCross, they live in Williston, North Dakota. I know that. But outside of what is in their affidavits and what is in the complaint, I don't have anything more, Your Honor. Thank you, Your Honor. The three arguments I want to focus on today about why we've put forward a rational argument that QEP is not allowed to deduct post-production costs is one, I want to focus on the North Dakota case law and precedent. Two, I want to focus on the district court's, their technical definition of the term operations and why that's an error. And three, that the district court's interpretation fails to provide meaning to every phrase, sentence, and word in the overriding royalty interest. So starting with North Dakota law, obviously the district court is sitting in diversity, so North Dakota law applies. There's five cases in North Dakota which deal with the deduction of post-production costs. And I will grant you that all five cases deal with a royalty and not an overriding royalty. I think it is a distinction without any meaning in this case because whether it's a royalty or an overriding royalty, neither of them bear the burden of production. So the five cases, there's two which allow the operator to deduct post-production costs. The first one is BICE and that one, the royalty language says the market value at the gas at the well. So clearly we're taking the market value at the well. We're not allowing post-production costs afterwards. The second one, which is from last year, is Blazey, which has to deliver to the credit of the lesser free of cost into the pipeline. And the pipeline being where the well is located. So again, the valuation point is on the well. It is not going to include post-production costs. Conversely, there's two cases, Kittleson and Newfield, which do not allow the deduction of post-production costs. Well, Kittleson is irrelevant because the contract there was explicit. And I would agree with you. Yeah, so it's irrelevant, right? Judge, I don't want to say it's irrelevant. I would agree with you that there's stronger language to allow, to prohibit the deduction of post-production costs. But there's express language that expressly does it. I'm quoting from it. I don't disagree with you, Your Honor. Proceed. In Newfield, you could say the same things. It says the word gross proceeds. Correct, thank you. I think the case I would most focus on is West v. All Purr Resources, where the royalty clause simply provides the lesser is to receive, quote, one-eighth of the proceeds of the sale of gas. And the North Dakota Supreme Court held that rational arguments could support the term that proceeds means gross proceeds or it means net proceeds. And in that case, not only did they find that it was ambiguous, they actually found in favor of the royalty owner because they said the drafter is the one who created the ambiguous language, and therefore, it must be Tell me the name of that case and the actual court. West, W-E-S-T v. All Purr, A-L-P-A-R Resources from 1980 in North Dakota, Your Honor. Is it North Dakota Supreme Court? Yes, Your Honor. Proceed. Here, I would compare this case to that. Here we have free and clear of all costs and expenses of development operations. The word operations has no qualifier. Yes, maybe it means production operations. I would certainly argue it means production operations and post-production operations. But I think a rational argument at a minimum can be made that operations without any qualifying language means more than just production operations as QEP wants to define. Well, let me be blunt and focus you. Every time that we had these in Missouri and Arkansas cases, we end up looking at Texas law. Now, there's the Texas cases that you know about. They're cited by the other party. The weight of authority and, of course, Williams and Myers in the end. They all look very, very bad for you. Now, why wouldn't, if we had to predict, why wouldn't we predict that the North Dakota Supreme Court, as they do many times, follow the Texas, Kansas, sometimes Arkansas cases? So, you see what the issue is. Why not Williams and Myers? You know what they say. An overriding rodent is a subject of a proportionate share of post-production costs, period, flat sentence in Williams and Myers. And I believe that is, that would be the general rule in North Dakota, but I think it can be modified. And to Texas law, just real quick, the Heider case there, that one deals with the royalty provision. I think it's actually overriding royalty provision, which says it's cost-free of gross production. And the dispute in that case is what does cost-free mean? Does it just mean cost-free production costs or does it mean cost-free of post-production costs as well? And the Texas Supreme Court said the drafter failed to distinguish between post-production and post-production. So, cost-free means everything. And I would say the same thing here. If you fail to differentiate between operations and post-production operations, it means both. Now, the district court does rely on four cases from the last eight years. I would say none of those cases are on point. None of them actually have an analyst of does operations include post-production operation costs. The closest one is Jay Phillippe from 2018, Louisiana's first case, first Chesapeake. But there, the real issue was are we dealing with an overriding royalty interest or are we dealing with a cost-free net revenue as an NRI? Well, Texas Supreme Court Chesapeake Exploration, I think it is. How about that case? Are you familiar with it? Because they have the flat sentence like Williams and Myers. Is that the Hyder case versus Chesapeake? Yes, it is Hyder on the other side. Yes. Sorry. So, what I would argue in that case, Your Honor, is that the royalty provision there says it's cost-free of gross production. What the Supreme Court found, they found in favor of the royalty owner in that case. So, what they found was that the word cost-free alone without any sort of qualifier meant it's totally cost-free. But you know the general propositions they have in that case, right? Yes, I do, Your Honor. Okay. What do you say about the general propositions in that case? I won't read them to you. Go ahead. Well, I think the general proposition would be the same in North Dakota, which is that an overriding royalty interest is free of production costs, but typically would pay post-production costs. That's exactly what Texas says. So, then we have this language in this case, which says it's free and clear of development and of cost of development operation. Why would that language exist but for it having a meaning? Now, in Hyder, they say, well, sometimes the drafters are not driven by logic, and that is why you would include that language, right? That language does not exist in North Dakota. That case law does not exist in North Dakota. North Dakota generally follows Texas, right? It does, but except when North Dakota has law directly on point, I would say. Proceed. In North Dakota, courts control all provisions of contract to give meaning to every sentence, phrase, and word. There's no dispute here that the overriding royalty interest by its very nature is free of production costs. Nevertheless, the district court construes the phrase free and clear of all cost and expenses of development and operation to simply mean what it already is. It's free of production costs. Respectfully, at a minimum, if you're taking every inference in favor of Highline, the inference would be that there was meaning for that phrase. And so the district court, I would argue the district court made a finding by saying when a quote said, let me find it here, sorry, one second. The district court said it appears that this is what happened in this case, is that the drafters purposely included surplusage in the language. There's no evidence of that. There's no hellish affidavit. There's no hellish deposition. There's nothing provided by the drafter which said they purposely included surplusage in the language. The other argument I wanted to get to, Your Honor, was the technical and industry use of the term operation costs, because this is what the district court is relying on. The district court mainly relies on four out-of-state cases. I think there's at least a dispute of fact of whether the term operation in the technical sense means just production operations. We cited to one. But the word is operating, right? It's operation. I thought it said operating. I mean, it ends with operation. Okay, proceed. But you keep saying operations, but keep going. I should get rid of the yes, Your Honor. Oh, I know. No, I'm sorry. Because it's on the operating. Proceed. We clarified it. So in our case, we provided an affidavit from our expert which says, yes, this language is used in the oil and gas industry to mean all operations from the beginning to the very end until it reaches its point of sale. Additionally, you have QEP and its SEC filings deferring operating costs as including all post-production costs. Wait, counsel, that's subject to many other rules. And I agree with you, Your Honor, but I think... Oh, my goodness. Don't even begin there. Go ahead. But I think it's evidence that just shows that the phrase can be used larger than just production. That's not in the oil and gas industry. That's in the accounting industry, counsel, in the SEC industry. Don't you think that's really far afield? I don't think it's too far afield. Okay. That's not... Okay. Proceed. And my final point, Your Honor, would be that no one disputes that everybody in the basis of this transaction is a sophisticated party. They chose this language on purpose. They all said that they... Excuse me. All my clients said that they understood that the meeting... What about the semi-waiver point about the five years of not saying anything? No, I think... Well, there's two... I want to talk about two things. There's the HELLIS and then there's the QEP. So when HELLIS was the actual operator, they would send checks to our clients. The only deductions on those checks show taxes. My clients had no idea until expert depositions, in this case, when we got the revenue dex from HELLIS that they were ever deducting post-production costs. On QEP's side, our clients did not learn until 2018 when they hired Joey Stevenson, a professional landman, to come in and audit. I thought some of the statements did show those costs. Aren't there mixed statements? Help me on that. I think on the QEP statements, you could make the argument if our clients would have looked close enough, they could have found it. But the statute of limitations in... Yeah, I agree with that, Your Honor. Go ahead. The statute of limitations in North Dakota for that kind of finding is 10 years. It's 28-01-15-2. I'm getting close to my rebuttal time, so I'm going to reserve the rest of my time for rebuttal. Thank you, Your Honor. Good morning, Your Honors. May it please the court and counsel, my name is Chris Christman. I'm representing QEP Energy Company in the case. Judge Graz, before I get into the heart of my presentation, on the question that you posed to Mr. McClain about jurisdiction, in addition to the affidavit that we submitted for NISQ jointly with Highline, in the record, there are a couple of places in the appendix where you might find the addresses for these folks, the plaintiffs at the time that they executed these contracts. It's in the appendix at 158 and 59 and also at 187. They signed some documents. Some of those were notarized and it indicated their place of residence in either North Dakota in the case of the La Crosse's and Empire Oil or in Montana in the case of NISQ royalty. Your Honors, we're asking that the court affirm the district court's summary judgment order in this case because the language of these overrides is clear and unambiguous. Counsel, let's just start with that. Why isn't the phrase expenses of operating susceptible of more than one meaning? In the oil and gas industry, the way that North Dakota's courts have interpreted So your argument depends upon finding that this is a technical meaning? It is dependent upon the fact that in North Dakota, whether it be in the West case in 1980 or the Blasey case in 2021, when the North Dakota Supreme Court is interpreting royalty provisions, or in this case an overriding royalty provision, the first place they look for the plain meaning is either in the treatises in oil and gas law or in other jurisdictions to determine if that phrase or those words in question are susceptible to more than one meaning. So it's in the context of an oil and gas document? It is, Your Honor. I believe so. And so in West, which is a good place to start, the Court determined to — in order to determine whether or not the term proceeds was unambiguous, it first turned not to extrinsic evidence, not to the party's testimony. It turned to other cases and authorities, including from other jurisdictions. And in West, the Court determined that there was a conflict among how other jurisdictions had interpreted the term proceeds in the context of a royalty provision. And from there, it concluded that that term was ambiguous and then applied other doctrines of construction and interpretation. In Blasey, 40 years later, the North Dakota Supreme Court followed the same roadmap, interpreting the term into the pipeline and what that would mean. And the first place it looked was not to extrinsic evidence or even evidence of industry custom and practice, but to other jurisdictions to determine how those jurisdictions interpreted the term into the pipeline. And there, the Court found that those interpretations were uniform, that there was not the same kind of conflict among other jurisdictions and authorities that it found 40 years earlier in West. Here, Judge Hovland followed the exact same analysis. He looked to the term development and operations and concluded, by looking at other authorities from other jurisdictions, Williams and Myers, Professor Kuntz's treatise, in addition to case law, that the case law was uniform. That number one, in the context of an overriding royalty, the presumption is that that overriding royalty will be free of production costs, the cost to drill the well, complete the well, operate the well. Let me ask you about that. If we reach the conclusion that operating and operations refers only to production expenses, how do we know when production ends and post-production begins? The received wisdom on that, Your Honor, in terms of the treatises of Williams and Myers and where it draws the line, and in cases like El Patron and Continental Resources, is that at the surface of the well, that is when production ends. The production phase is completed when the oil and gas is reduced to some form of possession. Now that's at the surface. So that's why transportation from the wellhead to the point of sale would be post-production? That's correct, Your Honor. To move it downstream, to get the gas gathered through the gathering lines, to get the oil transported either by pipeline or truck, to get the gas processed, all of those fall within the category of post-production costs. So that is where the courts and the authorities draw that line. And that's where Judge Hovland drew the line here as well, is that because the overriding loyalty is an interest at the surface of the well, it is exempt from those production costs to drill, to develop, to operate. But it is subject to those post-production costs unless, and I think both parties agree, that the contract creating the overriding loyalty instrument can change that received allocation. But the term development and operation doesn't do that. It simply reinforces it. Before I go into development and operation, Your Honors, I do want to point out that there was an original override that was entered into in this case in 2007 that does not contain any of that language. And that was a part of the district court's opinion, and it doesn't seem like Highline is really tackling that on this appeal. But that override that was originally entered into between Hellis and Highline does not address costs at all. And the court concluded that because it does not contain language that changes the allocation of post-production costs versus production costs in the context of an overriding loyalty, that Highline was in fact subject to post-production costs. I've been assuming this, let me ask you bluntly. The end of the sentence says, exploring, developing, and operating said property. What is, is the said property defined? The said properties are defined, Your Honor. I'm sorry, it's said property, singular, so help me with that. And I'm sorry, Your Honor, in the, is this in the acquisition agreement that you're referencing? Original, All I know is this. The ORI says that, no, I'm sorry, the original assignment says the ORI shall be free and clear of all costs and expenses whatsoever of exploring, developing, and operating said property. What's said property? Said properties are the leases that were assigned and from which the overrides are carved out. So those are the properties that are being referenced. Well, you said the property's a lease. I just heard you say, it's not, you don't operate a lease. You don't explore a lease. You don't develop a lease. Does property mean the oil? Does property mean the land? I believe that it means the mineral interests that are subject to the lease because the override is created out of the leasehold interest. So you have a mineral owner. Metaphysical off the bat. The override, the overriding royalty is an interest that is in the production as it comes out of the ground, but it is not a, by virtue of any kind of ownership in either the minerals or leasing the minerals. The overriding royalty, and this is, this does lead to the, the, the, the fundamental questions of what the override is. It is a property interest. The courts recognize it to be, but it's an interest at the surface because it's neither the mineral owner's less, ownership of the minerals that it has leased to the lessee, nor is it the lessee's interest because here it is either assigned in order to create an additional burden on the property's leases, production, or it is reserved when a party assigns that, and that's what happened here is that as Highline and the other plaintiffs below were taking leases, they would assign them to Helles and reserve for themselves these overrides. And in connection with those reservations, after the initial override, which is a reference to a net revenue interest and not a reference to, to assign to Helles, it doesn't have any language referencing costs. In the subsequent 31 overrides, they all had the same language of development and operation. Those are the, the 31 subsequent ones that Highline has an interest in. There were three overrides in the case. There was the original one that was entered into by the parties in 2007. Then there was a second one that I think Judge Benton, you may have mentioned earlier, that referred to developing and operating. Development and operation. And the, and the, exactly, and so these 31 that Highline has an interest in refer to development and operation. And just as in Jay Fleet, the Louisiana, the Louisiana District Court that granted summary judgment on this very similar issue, just as in the Martin case and the Danziger case, all of those cases referred to either free of operating costs or operation, the cost of operations. And in each instance, the court determined that operation related to the production phase and to costs associated with the production of the well, not to post-production costs that are traditionally shared between the parties. And I don't believe, Your Honors, that that renders this language surplusage. I believe that under North Dakota law, the different, there's an important difference between surplusage and rendering, which would just mean rendering the language redundant, and then rendering the language meaningless. The case that Highline cites in its brief is a U.S. Bank case against Conant on the issue of giving effect to all language in the document and the North Dakota Supreme Court's application of that doctrine when interpreting a conveyance. The 1906 conveyance at issue in that case conveyed all of the property to, to use another awkward term, the party of the second part. It then reserved the right to, in the same conveyance, explore for coal and use as much of the minerals and the surface as necessary in order to explore and develop coal. Unfortunately, it reserved that right to the party of the second part. And what the court said is it doesn't make any sense to reserve the right to coal if that is bestowed upon the party that is getting the entirety of the property. To read it that way, as opposed to a Scribner's error, the court said, would render that language meaningless. Here, this language is simply reinforcing the concept that the parties are splitting, are allocating production costs versus post-production costs such that Highline will be exempt from production costs but will be subject to its share of post-production costs. What I find interesting about the surplusage angle of the subsequent overrides is that's not the only redundant language in this agreement. Before you get to development and operation, you get to, you have language that says Highline will be free and clear, another redundancy of all costs and expenses. And so we can see in here that the parties are simply taking what one court has called and what we cite in our brief as a belt and suspender approach, or what Brian Gardner has called one of those things in the law, I think this is in the TMW case that we cite, that lawyers delight in, whether it be cease and desist or arbitrary and capricious. There are times when both courts and lawyers, when drafting, will use these terms. But it doesn't change the fact that operation has to be read under North Dakota law in a context. And that context here is not only alongside the term development and operation, but it's a context, like you had mentioned, Judge Graz, which is in an overriding royalty instrument, which is a part of a form document or at least a standard document that is used in oil and gas law. And that was an important consideration for the North Dakota Supreme Court in the Blasey case, where it noted that this — The experts clearly say this is a standard form. I don't believe that the experts have opined either way, Your Honor. The experts in this case. That's correct. Yeah. Yes. Oh, yeah. I'm sorry. That's what I thought you meant. I don't believe the experts in this case ever opined one way or the other if it was a standard form. Right. I could be mistaken, and I'm happy to be corrected on that. Mr. Stephenson, the expert that Highline retained, did submit declarations and affidavits that are a part of our record. I know that our experts' reports are a part of the record, too. Ms. Terry, who is one of our experts, may have opined on that being standard language. Rather than delve into the record or point to any of that, I would just simply rely upon the fact that both the treatises, whether it be Professor Kuntz or Williams and Myers, and the case law, certainly have seen this language come up repeatedly over the decades. It is development and operation are standard terms that are being used or being interpreted by other courts in the context of other instruments, and are certainly being interpreted by the scholars that delve into the nature of these metaphysical entities like overriding royalty interests. I don't believe that that renders this language surplusage here. It just simply reinforces what the parties intended when it came to exemption from production costs versus the allocation of post-production costs. In counsel's presentation, there were two cases that came up that are sort of on either end of the spectrum, where the language can be made clear that a party can be exempt from post-production costs. On one end of the spectrum is the Kittleson case, where the language in the underlying document clearly states that the party will be exempt from any post-production costs of gathering, processing, transportation, spells it out clearly. On the other end of the spectrum is the Hyder case, where the court, where the instrument in question adopted a very broad view. It just simply said, without limitation, it is cost-free. And the court concluded in that instance that that, the Texas Supreme Court concluded in that instance that that meant any cost. Here, we have the term free and clear of costs and expenses tied to standard industry language. Before your time is completely gone, did you hide the deductions for five years? I think that's what the other side was saying. No, Your Honor. I think there were two different time periods that Highline's counsel represented. There's the 2007 to 2012 period. Your predecessor hid them. Your Honor, the predecessor included it as a part of the price and simply included the deduction of post-production costs as a reduction of the value presented on the check stubs that were sent monthly. The gas, in this case, is sold near or at the well. And so the costs are a part of the net value that's received from the producer. But no, when QEP took over and acquired these interests from Hellas, beginning in December of 2012, they presented on the check stubs the price, the value, the post-production costs, and the taxes. It's like a commodities market where the real price or some price is always known at all relevant times by sophisticated people or not. Certainly, sophisticated parties can determine the price. They're going to know. No, but, Your Honor, I mean from market publicly available. You know what I'm trying to refer to, like pigs and other commodities, where you know. So every day they tell you what the prices are, basically. It is very close to that, Your Honor. The only reason I'm hedging on it is because when it comes to gas, some of the more regional prices can be proprietary where you may have to pay for a subscription to find. But other times, some newspapers will post the regional prices in it in addition to what they call a national price like NYMEX or others. Same thing for oil. There can be a West Texas intermediate price, which everybody is looking to, but those can also be tailored for the various regions. Thank you. Thank you, Your Honors. I appreciate it. Okay, Mr. McClain. May it please the Court. I want to start with where we just ended. Just to make clear, my clients did not sit on their hands since 2012 and knowing that these deductions were happening. As soon as they phoned in 2018, they did take action. They sent letters to QEP that were not responded, and they followed up again, and then they started a lawsuit. For five years, they should have known, right, as sophisticated parties? I don't agree with that, Your Honor. Say it again. I do not agree that they should have known. I do not agree. Well, this is summary judgment. What's the record show on that? Well, I don't think the Court did not determine that on summary judgment. It was not an issue to the Court on summary judgment, but . . . Did the District Court even mention it? I don't think they did. I'd have to go back and look, though, Your Honor. Proceed. Okay. So getting back to the language, free and clear of all development and all costs and expenses of development and operation, it is unique language. It is not common that we find all of these. There's no North Dakota case on point. The District Court cited four cases in 80 years. I would argue that none of those cases are on point for the reasons set forth in our brief, but another point is I want to make. In North Dakota, there is a case called Abell, A-B-E-L-L, 2017, North Dakota 163, which talks about drilling operations. They define the term drilling operation as broadly as possible as including even the building of roads before you even start drilling the well, any preparation work. See, if the North Dakota Supreme Court is saying drilling operations includes anything from building roads to preparation of site to obtaining a permit, yet we want to defer operations now as just meaning production operations. I don't think that that would be supported by the North Dakota Supreme Court. And then finally, QEP was talking about that this was reinforced language, but there's no evidence of that. All the plaintiffs provided affidavits that are in the record saying, no, we used this language on purpose. It was to prohibit the deduction of post-production costs. There's no evidence contrary to that. There's nothing from Hellas in the record. So at the end of the day, I think this comes down to has Highline put forth a rational argument for a reasonable interpretation of the overriding royalty interest which prohibits the deduction of post-production costs, and we submit we have. Thank you, Your Honor. We appreciate your time and consideration. Thank you, Mr. McLean.